State on the relation of E. L. GREENE, J. M. NIFONG and HENRY
    SHEETS v. W. S. OWEN, L. M. KIRSCHNER and
        J. A. STONE.

(Decided November 21, 1899.)

*Quo Warranto—Title to Office—County Board of Educa-
    tion, Act 1897, Chap. 108—County Board of School
    Directors, Act 1899, Chap. 732, also Chap. 3.*

1. An officer has a right of property in his office, of which he can
    be deprived only in accordance with the law of the land; and
    while the Legislature may abolish the office, it can not con-
    tinue it and transfer its duties and emoluments to another
    against the will of the vested incumbent. *Hoke v. Hender-
    son*, 15 N. C., 1.

2. An office is a contract between the officer and the State, by which
    he is entitled to the emoluments upon performance of the
    duties, as long as the office continues. *Ward v. Elizabeth
    City*, 121 N. C., 3.

3. While the County Board of Education, established by Act of 1897,
    cnap. 108, was abolished by Act of 1899, chap. 374, it was prac-
    tically re-established by Act 1899, chap. 732.

4. The County Commissioners, Clerk of Superior Court, and Register
    of Deeds being constituted under the Act of 1897, chap. 108,
    the appointing body to elect the Board of Education, are
    appropriately the proper body to fill vacancies therein, until
    the ensuing election.

CIVIL ACTION in the nature of *quo warranto* to try the
title to the office of County Board of School Directors of
Davidson County, heard upon the pleadings by *Robinson, J.,*
at Fall Term, 1899, of the Superior Court of DAVIDSON
County.

The complaint alleged that the plaintiffs were rightfully
entitled to the office under provisions of the Act of 1897,
chap. 108, and were wrongfully excluded therefrom by
defendant claiming under legislation of 1899.

The answer alleges that the defendants are legally in possession and entitled to the office; that the Act of 1897, chap. 108, was repealed by the Act of 1899, chap. 374, and that they were themselves elected by the Legislature of 1899 as the County Board of School Directors. It also alleges that none of the plaintiffs were original appointees, and that two of them, Greene and Sheets, were appointed after defendants had been elected by the Legislature, and that the appointment of Nifong was void, because the original appointing body had no authority to fill vacancies.

His Honor, upon the pleadings, rendered judgment in favor of defendants. Plaintiffs appealed.

*Messrs. Walser & Walser,* for appellants.
*Mr. E. E. Roper,* for appellees.

DOUGLAS, J., writes the opinion of the Court.

CLARK, J., writes dissenting opinion as to Nifong.

DOUGLAS, J. This is an action in the nature of *quo warranto* brought to test the title to the office of County Board of School Directors. On the first Monday in June, 1897, under the provisions of sec. 6, chap. 108, of the Public Laws of 1897, G. W. Holmes, T. H. Strohecker and R. S. Greene, Jr., were elected as members of the County Board of Education for the term of 3 years by the joint action of the County Commissioners, the Clerk of the Superior Court, and the Register of Deeds. On the 6th day of September, 1897, R. S. Greene, Jr., resigned as a member of said Board and John R. Miller was elected to fill the vacancy by the County Commissioners, the Clerk of the Superior Court, and the Register of Deeds, the original appointing power. Sometime during the year 1898, T. H. Strohecker resigned as a member of said Board, and J. M. Nifong was elected to fill

the vacancy by said Commissioners, Clerk, and Register of Deeds. On the 3rd day of July, 1899, John R. Miller resigned from said Board, which had then become, by virtue of chap. 732, of the Laws of 1899, the County Board of School Directors, and Ed. L. Greene was elected to fill the vacancy by the remaining members of the Board. On the 3rd day of July, 1899, George W. Holmes resigned as a member of said Board, and Henry Sheets was elected by the two remaining members of the Board to fill the vacancy. It will thus be seen that J. M. Nifong is the only plaintiff in this case claiming under an election prior to the passage of the Act of March 7, 1899, being chap. 732 above mentioned. His case therefore stands upon a different footing from the others, and will be considered first.

Some things must be considered settled law in spite of the volcanic energy of a progressive and expanding age. Among these is the doctrine laid down in *Hoke v. Henderson,* 15 N. C., 1, that an officer has a right of property in his office of which he can be deprived only in accordance with the law of the land; and that while the Legislature may abolish the office, it can not continue the office and transfer its duties and emoluments to another against the will of the vested incumbent. The opinion in that celebrated case was delivered at the December Term, 1833, of this Court, by Chief Justice RUFFIN, and was concurred in by his associates, Judges DANIEL and GASTON, men whose names are the expression of the highest qualities that can adorn the bench. This opinion has never been questioned by this Court, but on the contrary has been repeatedly cited and approved, affirmed and reaffirmed, until its very name has become the embodiment of a vital principle. We find it cited with approval upon one point or another in the following cases: *Houston v. Bogle,* 32 N. C., 496; *State v. Moss,* 47 N. C., 66; *Thomp-*

*son v. Floyd,* 47 N. C., 313; *State v. Glenn,* 52 N. C., 321,
327; *Cotton v. Ellis,* 52 N. C., 545; *Barnes v. Barnes,* 53
N. C., 366; *Galloway v. Railroad,* 63 N. C., 147; *State v.
Smith,* 65 N. C., 369; *King v. Hunter,* 65 N. C., 603; *Clark
v. Stanly,* 66 N. C., 59; *Brown v. Turner,* 70 N. C., 93;
*Bunting v. Gales,* 77 N. C., 382; *Vann v. Pipkin,* 77 N. C.,
408; *Prarie v. Worth,* 78 N. C., 169; *Lyon v. Aikin,* 78
N. C., 258; *McNamee v. Alexander,* 109 N. C., 246; *State
v. Cutshall,* 110 N. C., 545; *Board of Education v. Kenan,*
112 N. C., 568; *State v. Womble,* 112 N. C., 867; *Trotter
v. Mitchell,* 115 N. C., 193; *McDonald v. Morrow,* 119 N. C.,
676; *Wood v. Bellamy,* 120 N. C., 216; *Ward v. Elizabeth
City,* 121 N. C., 3; *Caldwell v. Wilson,* 121 N. C., 468; *Mil-
ler v. Alexander,* 122 N. C., 721; *Day's* case, 124 N. C.,
362, 366; *Wilson v. Jordan,* 124 N. C., 683, 694; *Bryan v.
Patrick,* 124 N. C., 651, 666.

In *Ward v. Elizabeth City, supra,* this Court says: "The
only restriction upon the legislative power is that after the
officer has accepted office upon the terms specified in the act
creating the office, this being a contract between him and the
State, the Legislature can not run him out by an act purport-
ing to abolish the office, but which in effect continues the
same office in existence. This is on the ground that an office
is a contract between the officer and the State, as was held in
*Hoke v. Henderson,* 15 N. C., 1, and has ever since been fol-
lowed in North Carolina down to and including *Wood v.
Bellamy, supra,* though this State is the only one of the 45
States of the Union which sustains that doctrine."

In the above list, we have included only those cases where
it is directly cited by name in the opinion of the Court, omit-
ting all those merely tending to sustain it.

In reviewing the list of the judges who wrote the above
opinions or concurred therein, we find the name of every.

Chief Justice who has since presided over this Court, and of all the Associate Justices before whom the question was raised.

An examination of the constitutional history of the State, we think, will show conclusively that the principles so clearly enunciated in *Hoke v. Henderson* have not only received the practically unanimous approval of succeeding judges, but have by direct implication been repeatedly ratified by the people themselves. The first "Constitution of North Carolina" as a State was framed by a "Congress" elected and chosen for that particular purpose, which assembled at Halifax on the 12th day of November, 1776, and remained unchanged until the amendments of 1835. It was this Constitution whose provisions were construed in *Hoke v. Henderson*. Since this decision was rendered there have been 5 separate and distinct constitutional conventions, *all* of which might, but *none* of which *have* abrogated or modified the principle of that opinion. In 1835, a constitutional convention met on June 4th, and framed amendments to the Constitution of 1776, which were ratified by the people. In 1861 a convention met and on May 20th passed the ordinance of secession, with some other amendments, none of which were submitted to the people. In 1865 a convention met on October 9th, repealed the ordinance of secession and passed an ordinance prohibiting slavery. This convention reassembled in May, 1866, and further amended the Constitution, but, with the exception of the above ordinances relating to secession and slavery, the amendments were rejected upon submission to the people. A convention, called by General Canby under the Reconstruction Act of Congress, assembled on January 14, 1868, and framed the "Constitution of 1868," which was ratified by the people on April 24, 1868, and approved by Congress on June 25, 1868. In 1875, a con-

vention assembled on September 6th, and amended the Constitution in several particulars, its action being ratified by the people at the election of 1876.

In addition to these conventions, several amendments have been made by legislative action and popular ratification, such as the celebrated "Free Suffrage" amendment of 1854, and those prohibiting the payment of the Special Tax Bonds, relating to the election of Trustees of the University, increasing the number of Justices of the Supreme Court, and others unnecessary to mention.

The constitutional history of this State is more fully set forth in the concurring opinion of DOUGLAS, J., in *Wilson v. Jordan*, 124 N. C., 707.

The various amendments made many changes of far-reaching results, including the successive repudiation of the governments of the United States and the Confederate States, but the underlying principle of *Hoke v. Henderson* remained unchanged. It survived the wreck of Southern institutions, weathered the storm of civil war, escaped the iconoclasm of reconstruction, and stands before us hoary with age, but apparently fresh from the fountain of perpetual youth. Any one of these conventions might have adopted an ordinance or constitutional amendment, certainly valid in its future operation, that all offices should be merely public agencies, held at the will of the creative principal, at the the will of the Legislature if of legislative creation, or at the will of the people if of constitutional provision.

The convention of 1835 assembled within less than eighteen months after the rendition of the opinion, and were reminded of it by the presence of DANIEL and GASTON as delegates from their respective counties. So far from expressing any disapproval, they completed the absolute independence of the Judiciary by providing that "the salaries of the Judges of the

Supreme Court, or of the Superior Courts, shall not be diminished during their continuance in office."

In *Caldwell v. Wilson,* 121 N. C., 425, this Court says· "The statute now under consideration is not retrospective and does not interfere with any vested right. Being a part of the act originally creating the office of Railroad Commis-. sioner, it *'prescribes'* a rule of property in said office, and modifies the extent of interest and tenure therein *'prospectively.'* The defendant, taking under the act, holds subject to the act, and, relying upon his contract, is bound by all its provisions. One of its express provisions was the reserved right of the Legislature to remove, and the power and duty of the Governor to suspend under a given state of facts. This power of suspension, together with the necessary method of its enforcement, was assented to by the defendant in his acceptance of the office." And again on page 472, we say: "The only property he could have in the office was that given to him by the statute, which must be construed in all its parts. His commission, which is his title deed, appears to us with the fateful words of the creative act written across its face by the hand of the law."

With this decision before them, the Legislature in bringing forward into the Corporation Commission Act the substantial provisions of the Railroad Commission Act *omitted* all sections providing for the suspension or removal of a Commissioner, thus leaving the principle of *Hoke v. Henderson* in full force and effect. In fact, among all the offices created or re-created by the recent Legislature, not one seems in any manner to have been withdrawn from the protection of that doctrine.

In *Railroad Co. v. Baugh,* 149 U. S., 368, the Supreme Court of the United States says: "Notwithstanding the interpretation placed by this decision upon the 34th section

of the Judiciary Act of 1789, Congress has never amended that section; so it must be taken as clear that the construction thus placed is the true construction, and acceptable to the legislative as well as to the judicial branch of the govern-. ment." May we not say the same of *Hoke v. Henderson?*

That the members of the County Board of Education are public officers is expressly held in *Barnhill v. Thompson,* 122 N. C., 493. It is contended by the defendants that the County Board of Education was abolished by chap. 374 of the Laws of 1899, ratified on March 4, 1899. This is true; but we are compelled to hold that it is practically re-established by chap. 732, ratified on March 7, 1899. The new County Board of School Directors, created for the same general purposes and charged with the same general duties, is in effect but a continuation of the old Board under a new name. A careful examination of the two acts will show this to be so, and the few changes in name and other non-essentials do not materially affect the question. The identity of the chrysalis is not changed even by the gorgeous wings of the butterfly, as the same individual life runs through all its forms. It is well settled that statutes *in pari materia* are to be construed together, certainly when passed at the same session of. the Legislature, and, under certain circumstances, even when passed at different sessions. *State v. Bell,* 25 N. C., 506, 508; *State v. Woodside,* 31 N. C., 496, 501; *State v. Melton,* 44 N. C., 49; *Simonton v. Lanier,* 71 N. C., 498, 503; *Rhodes v. Lewis,* 80 N. C., 136, 139; *Wilson v. Jordan, supra,* p. 687; Black Interpretation of Laws, sec. 86; Endlich Interpretation of Statutes, sec. 45; Potter's Dwarris on Statutes, 190. Many cases from other jurisdictions are cited in the above authorities.

It is also contended by the defendants that under the Act of 1897 the County Commissioners, the Clerk, and Reg-

GREENE *v.* OWEN.

ister of Deeds had no authority to fill vacancies.. We think they had such power necessarily and by direct implication. As the County Board of Education was charged with continuing duties and responsibilities, it was evidently the intention of the Legislature that it should be a continuing body, at all times qualified to perform the responsible duties imposed upon it. To fulfill this intention, it is evident the power to fill vacancies must reside somewhere, and we can see no place more appropriate than in the body possessing the original power of appointment. This is clearly the logical deduction by analogy, and has been so held in other jurisdictions. 19 Am. & Eng. Enc. of Law, 430; Throop on Public Officers, sec. 436.

It is further urged by the defendants that this is only an $8 office and therefore beneath the notice of a court of justice. For this somewhat novel position, the only authority to which we are cited is the maxim *"de minimis non curat lex."* It may be an $8 office, but does it involve only an $8 principle? Where would the learned counsel draw the line? Eight dollars with board is equal to the monthly wages of many a farm hand, and can we say that his month's labor is beneath our notice? Such a proposition commends itself neither to our judgment nor our conscience. We must stand by the *principle* as we have laid it down, and give to all alike its equal protection. Moreover, why should the defendants complain? Is the office any greater to them than to the plaintiffs? They found the plaintiffs in possession and promptly ousted them, and have resisted with the utmost vigor all attempts at repossession. The records of other cases show the heroic efforts made to obtain possession of similar offices by those who unite in saying that it would be beneath the dignity of this Court to reinstate the rightful owner.

We are, therefore, compelled to hold that J. M. Nifong is

lawfully a member of the County Board of School Directors of Davidson County, and is entitled to the immediate possession of the office with all its duties, privileges and emoluments, to hold the same until the first Monday in June, 1900. It makes no difference whom he dispossesses, as his claim is superior to any of the new Board, and they all must stand out of his way.

The principles enunciated above equally require us to hold that the remaining plaintiffs, Green and Sheets, are not entitled to be members of the County Board of School Directors, as they were not elected until after the passage of the Act of 1899, and therefore had no vested rights that could be affected by the passage of said act or any election held thereunder. In fact, they never were members of the Board, as at the time of their assumed election there were no vacancies to be filled. The vacancies caused by the resignations of Miller and Holmes were filled *eo instanti* by the appointees of the Legislature, who were somewhat in the nature of remaindermen waiting for the determination of the particular estate.

It is urged that there are three legislative appointees and only two eligible places, but this does not concern the plaintiffs, and the defendants are not asking us to adjudicate their respective rights as between themselves. It may be that the two who first qualified filled and exhausted the vacancies. If so, the third man must await the determination of Nifong's estate in the office.

In all the similar cases that have been brought before us, we have never held the act to be unconstitutional except in so far as it interfered with the vested rights of the incumbent. The Legislature had ample authority to pass chap. 732 of the Laws of 1899, and also had authority to elect, as they did by chap. 3 of said laws, subject only to the rights of the incumbents. Of course where the vacancy was already filled by

the continuation of the term of the former incumbent, there was no room in that particular office for anyone else until a vacancy occurred by expiration of the term, resignation, death or disqualification.

Every act of the Legislature carries with it the presumption of constitutionality, and, where it becomes our duty to declare any part of such act unconstitutional, it is equally our duty to give full force and effect to the remainder of such act, provided it remains capable of operation. In other words, we should give effect to the expression of the legislative will so far as it does not conflict with the organic law, and should declare it utterly void only when its unconstitutionality so far permeates its essential features as to destroy its practical operation. *Berry v. Haines,* 4 N. C., 428; *McCubbins v. Barringer,* 61 N. C., 554, 556; *Johnson v. Winslow,* 63 N. C., 552, 553; *Gamble v. McCrady,* 75 N. C., 509, 512; *State v. Joyner,* 81 N. C., 534, 537; *Riggsbee v. Durham,* 94 N. C., 800, 805; *State v. Barringer,* 110 N. C., 525, 529; *McCless v. Meekins,* 117 N. C., 34, 39; *Russell v. Ayer,* 120 N. C., 180, 189; *Rodman v. Washington,* 122 N. C., 39, 42; *Packet Co. v. Keokuk,* 95 U. S., 80; Cooley's Const. Lim., 178, 215.

The judgment of the court below must be reversed as to the plaintiff J. M. Nifong in accordance with this opinion, and affirmed as to the other appellants.

The costs in this Court must be divided between appellants and appellees.

Modified and affirmed.

CLARK, J., dissenting, as to Nifong. In addition to the reasons given in dissenting opinion in *Abbott v. Beddingfield,* at this term, it would seem that *Hoke v. Henderson* is expressly against the plaintiff Nifong's claim.

The allowance to the plaintiff is travelling expenses and $2.00 per day for time in session, the regular sessions being 4 times a year, with same allowance for any special session if ordered. This per diem of $8 per year is evidently to cover only actual expenses, and it is going far to hold that this is a lucrative office; yet only lucrative offices were taken by *Hoke v. Henderson* out of legislative control. The proposition which I advance, however, can not possibly be better stated than by Brother MONTGOMERY in *Railroad v. Dortch,* 124 N. C., 663, 667. This position is not so much an office itself as an electoral body to select officers. It is like the power given to Judges to appoint Clerks of the Courts, which *Hoke v. Henderson,* 15 N. C., at page 22, holds can be taken from them because such power of appointment, the selection of other public agents, was intended to be an honorable, and not a lucrative, appointment. In like manner, all the Justices of the Peace in 1868, who up to that time had the election of sundry county officers, were deprived of their life offices, and no one questioned the power to do so, but the Convention had no more power to do this than the Legislature, if (as now contended) they held office by contract with the State.

Besides, by the Constitution, Art. IX, the entire matter of the control of public schools is vested in the Legislature, and everyone who took office in the school system took with notice that the control and management thereof was in the Legislature (*Caldwell v. Wilson,* 124 N. C., 425), and that it could (if it had such control) remodel and change the system according to its views of the public interest without regard to the incidental benefits to office holders which were in subordination to that of the great end to be served—the interests of the public. The object was not the creation of offices but the public welfare, and to that end the Legislature was placed by the Constitution in full control of the system, to make from time to time such changes as they deemed for the public good.

The most ultra advocates of the power of the courts to declare legislation unconstitutional have always held that it should only be done when there was no reasonable doubt and for grave and weighty reasons. It would seem that $8 per year, $2 per day, if it more than covers the actual board of the incumbent while in session, is too small a consideration to justify the courts in setting aside an act of the Legislature providing for a new system for the benefit of the school children of the State, and annulling the election of officers made by the General Assembly itself to carry that system into effect.

Again the office once held by the plaintiffs is entirely different in title and in substance from that from which they are seeking to oust the defendants.

Laws of 1899, chap. 374, page 741, abolishes the Board of Education, and chap. 732, sec. 13, page 906, provides School Directors, and by chap. 3, on page 27, the General Assembly itself elected School Directors. The duties of School Directors are different from the duties required of the former Board of Education. Boards of Education, under the Laws of 1897, divided counties into districts and appointed five men as School Committee for each township. This Committee had full charge of the schools of the township, white and colored. Under Laws 1899, School Directors appoint no committees, but appoint School Trustees for each township, who divide the townships into districts, and who appoint committees of three for each district in the township, appointing white committeemen for each white district, and colored committeemen for colored districts, giving to their district committee the right to employ teachers and control schools. Secs. 16, 23 and 24. Under the Laws 1897, the right to elect County Supervisors was given to an electorate composed of the Clerk of the Superior Court, the Register of Deeds, and the Board

of Education. The Laws of 1899 give this power to the
School Directors exclusively, sec. 15. The School Directors
have power not possessed by the County Board of Education,
and the main power (that to appoint committeemen) which
the old Board had, has been abolished and conferred upon
Township Trustees. About the only powers and duty com-
mon to both boards were to meet four times a year and to
draw the same pay. The school money was to be appro-
priated to the townships per capita under both laws, which
is only a matter of calculation and purely clerical. In *Day's*
case, 124 N. C., 362, the Court puts its decision upon the
ground that the committee appointed by the Legislature per-
formed just the same duties required of the Superintendent,
and that the office was the same, only to be performed by
several instead of one. In no case heretofore has the Court
held, when the duties of the office are different, the old officer
can perform them.

Whatever views may be entertained as to *Hoke v. Hender-
son*, it certainly ought not to be extended. There has long
been a feeling that it has been construed far beyond the inten-
tion of the Court which delivered it. This feeling is tersely
expressed by Justice DOUGLAS, speaking for the Court, in
delivering the opinion in *Caldwell v. Wilson*, in December,
1897. He said, 121 N. C., page 468: "The varied and
extraordinary claims made thereunder (*Hoke v. Henderson*)
and the fact that we are the only State in the Union recog-
nizing that doctrine may well cause us to pause and consider
if we have not carried it to its fullest legitimate extent. It
may be doubted if the great Chief Justice himself ever con-
templated the extent to which it would be carried." This
solemn and timely warning was uttered nearly two years ago.
In *Hoke v. Henderson*, 15 N. C., 1, the Legislature did not
attempt to abolish an office. In *Colton v. Ellis*, 52 N. C.,

125——15

545, the office the Legislature attempted to abolish was a Federal office over which it had no power of abolition.    In *Wood v. Bellamy,* 120 N. C., 212, the act on its face purported to be only an amendment, and this Court held that the act was an amendment, and that there was no change except in name. Not until the last term of this Court was there any decision in North Carolina that an office, not provided for in the Constitution, but one created by the Legislature, could not at any time be abolished, and the duties transferred to another officer.    It had not theretofore been supposed that the doctrine in *Hoke v. Henderson* was so comprehensive.

In the present case, the new office has different duties and functions from the old one, and under all the decisions, prior to the present term, the plaintiff Nifong can not recover.

I concur in the result as to the other parties.